Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
Gabrielle A. Hamm, Esq.
Nevada Bar No. 11588
ghamm@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.442.9887

*Proposed Attorneys for the Debtors*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | ) Case No.: 22-13252-mkn |
| | ) |
| BASIC WATER COMPANY, | ) Chapter 11 |
| Debtor. | ) |
| | ) Hearing Date: N/A |
| | ) Hearing Time: N/A |

### OMNIBUS DECLARATION OF STEPHANNE ZIMMERMAN IN SUPPORT OF DEBTORS' PETITIONS, FIRST DAY MOTIONS, AND RELATED RELIEF

I, STEPHANNE ZIMMERMAN, hereby declare as follows:

1.    I am over the age of 18 and mentally competent.

2.    I am the President and Chief Financial Officer of Basic Water Company, a Nevada corporation ("**BWC**"), which is the sole member and manager of Basic Water Company SPE 1, LLC ("**SPE**" and, together with BWC, "**Basic Water**" or the "**Debtors**"). In that capacity, I am familiar with the Debtors' daily business, operational, and financial affairs. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Debtors' management and the Debtors' business and legal advisors. If called upon to testify as to the content of this Declaration, I could and would do so.

1

3.    I make this declaration in support of the Debtors' voluntary Chapter[1] 11 petitions (the "**Petitions**") and the following motions (collectively, the "**First Day Motions**").

    a.  Emergency Motion for Order Directing Joint Administration of the Debtors' Chapter 11 Cases Under Fed. R. Bankr. P. 1015(b) (the "**Joint Administration Motion**");

    b.  Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 for Entry of an Order (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Services on Account of Pre-Petition Claims and (II) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "**Utilities Motion**"); and

    c.  Debtors' Emergency Motion for Entry of an Order Authorizing Maintenance of Existing Bank Accounts and Cash Management System and Related Relief (the "**Bank Accounts Motion**").

4.    I also submit this declaration in support of the following:

    a.  Debtors' Application for Entry of an Order Under 11 U.S.C. §§ 327(a), 328, 329 and 331 and Fed. R. Bankr. P. 2014 and 2016 Authorizing the Employment and Retention of Schwartz Law, PLLC as Attorneys for the Debtors-in-Possession (the "**Schwartz Law Application**");

    b.  Debtors' Application for Entry of an Order Under 11 U.S.C. §§ 327(a), 328, 329 and 331 and Fed. R. Bankr. P. 2014 and 2016 Authorizing the Employment and Retention of Force Ten Partners, LLC as Financial Advisors for the Debtors-in-Possession (the "**Force Ten Application**"); and

---

[1]    Unless otherwise indicated, all chapter and section references are to the Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"). All references to a "**Chapter**" or "**Section**" shall be to the Bankruptcy Code. "**Bankruptcy Rule**" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. "**Local Rule**" or "**LR**" references are to the Local Rules of Bankruptcy Practice of the United States Bankruptcy Court for the District of Nevada.

c.  Motion for Administrative Order Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals ("**Interim Compensation Motion**").

5.  The Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on September 10, 2022 (the "**Petition Date**"), thereby commencing Case No.22-13252 and Case No. 22-13253 (together, the "**Chapter 11 Cases**").

6.  The Debtors continue to operate as a debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

7.  To date, the Office of the United States Trustee for Region 17 (the "**UST**"), which includes the District of Nevada, has not appointed a committee of unsecured creditors in either of the Debtors' Chapter 11 Cases.

8.  No case trustee or examiner has been appointed by the UST, and the Court has not entered an order directing the appointment of an estate officer, in these Chapter 11 Cases. *See, id.*

## BACKGROUND

**A.    History of the Debtors' Business**

*Initial Construction of the Basic Complex, Appropriation of Water, and the Industry Water Delivery Contracts (1941 – 1969)*

9.  Basic Water is a water delivery company with a history dating back to 1941. Then, Anaconda Copper Company built Basic Magnesium, Inc. for the Federal Government to produce magnesium. Often described as the "miracle metal," magnesium was needed in large supply to build airplane bodies and other materials critical to the Allied effort in World War II. These magnesium production facilities, which were officially titled codename Plancor 201H, encompassed a complex approximately two miles in length that included a chlorine plant, ore preparation plant, chlorination plant, metals recovery plant, and electrolysis plant, as well as the support facilities for each (collectively, the "**Basic Complex**"). Until 1942, the town created to house Basic Complex workers was unofficially known as the "Basic Townsite." That year, the town was given the official namesake "Henderson" in honor of famed Nevadan and former U.S. Senator Charles Belknap Henderson.

10.     To bring power and water from Lake Mead over the River Mountains and some 17 miles to the Basic Complex, the Defense Plant Corporation, an entity chartered by Congress in anticipation of war hostilities and assigned the task of expanding production capabilities for military equipment, constructed transmission lines from Hoover Dam and certain facilities to provide water and power supplies from Lake Mead (the "**Water Facilities**"). The Water Facilities included, among other things, an intake structure, pumping station, and electrical control house at Lake Mead; booster pumping stations and reservoirs; a pipeline of 40 inches diameter from Lake Mead to the Basic Complex traversing a distance of about 16.6 miles; additional pipelines from the terminal reservoir to points of use; a transmission line to provide power for pumping, transformer stations, a telecommunications line, and appurtenant facilities.

11.     On January 28, 1942, Defense Plant Corporation applied to the State of Nevada for a permit to appropriate 45 cubic feet per second (c.f.s.) of water from Lake Mead (equivalent to 32,587 acre feet per year (hereinafter, "**afy**") of water at a continuous flow), for milling and metallurgical purposes, to be conducted to the Basic Complex through the Water Facilities. The permit was approved and, on June 21, 1948, after construction of the Water Facilities, the State issued Certificate of Appropriation of Water No. 3118 ("**Certificate No. 3118**") to Defense Plant Corporation with a priority date of January 28, 1942.

12.     On March 28, 1942, Defense Plant Corporation applied to the State of Nevada for a permit to appropriate 12 c.f.s. of water from Lake Mead (equivalent to 8,690 afy of water at a continuous flow), for municipal purposes, to be conducted to the Basic Complex through the Water Facilities. The permit was approved and, on June 21, 1948, after construction of the Water Facilities, the State issued Certificate of Appropriation of Water No. 3119 ("**Certificate No. 3119**") to Defense Plant Corporation, with a priority date of March 28, 1942.

13.     By 1944, the Allies' need for magnesium had dwindled and the Basic Complex was shut down. In 1947, the War Asset Administration offered Henderson—the whole town—for sale as war surplus property. However, to save the town, the Nevada Legislature unanimously approved a bill giving the Colorado River Commission of Nevada (the "**Commission**") authority to purchase

the Basic Complex for $24 million with $1 as a down payment and the balance to be paid from leasing the facilities to private industries.

14.     On June 3, 1949, the United States, acting through War Assets Administration, sold and conveyed the Basic Complex to the Commission, subject to certain leases und sales of properties in the townsite of Henderson and certain leases with options to purchase portions of the Basic Complex between the United States and four manufacturers that operated production facilities within the Basic Complex (together with their successors-in-interest and assigns, the "**Industries**"). The Industries are currently comprised of the following companies: EMD Acquisition LLC, a Nevada limited liability company, d/b/a Borman Specialty Materials (successor-in-interest to American Potash & Chemical Corporation) ("**Borman**");[2] Lhoist North America of Arizona Inc., an Arizona corporation (successor-in-interest to The Flintkote Company) ("**Lhoist**");[3] Titanium Metals Corporation, owned by Precision Castparts Corp., a Delaware corporation (successor-in-interest to Titanium Metals Corporation of America) ("**Timet**"); and Pioneer Americas LLC, a Delaware limited liability company, d/b/a Olin Chlor Alkali Products (successor-in-interest to Stauffer Chemical Company) ("**Olin**").

15.     In May of 1942, the Commission sold separate portions of the Basic Complex to the Industries, with each acquiring the land upon which its particular manufacturing facility was located. To own and manage the assets that would be used in common by the Industries, including power distribution facilities, railroad facilities, evaporation ponds, several thousand acres of land, and the Water Facilities, the Industries formed Basic Management, Inc. ("**BMI**").

16.     Pursuant to that certain Agreement of Sale dated May 23, 1952, by and between the State of Nevada, acting by and through the Commission, and BMI, the Commission sold the residual assets to BMI, including, among others, all of the Water Facilities and all of the rights

---

[2]     Borman is believed to be the ultimate, indirect successor of Western Electro-Chemical Company, which was sold in 1954 to American Potash, who continued to operate the site until it was acquired by Kerr-McGee Chemical in 1967. In 2003, Kerr-McGee spun off the chemical division and renamed it Tronox. The Electrolytic Products Division of Tronox was purchased by EMD Acquisition LLC on September 1, 2018, and became known as Borman Specialty Materials.

[3]     Lhoist is believed to be the ultimate successor of The Flintkote Company by its acquisition of Chemical Lime Company.

under Certificates Nos. 3118 and 3119, subject to a prior assignment by the Commission of a partial interest in Certificate No. 3118 to the extent of 5 million gallons daily (equivalent to 7.74 c.f.s. or 5,603 afy) to Western Electro-Chemical Company, predecessor of American Potash & Chemical Corporation, dated May 20, 1952.

17.     Between August 26, 1958 and August 1, 1963, BMI assigned partial interests in Certificate No. 3118 to the other three Industries (collectively with the Commission's assignment to Western Electrochemical Company, the "**Industry Water Rights**").[4] On January 1, 1965, BMI entered into contracts with each of the Industries to deliver water to them through the Water Facilities in accordance with the Industry Water Rights.

18.     BMI also entered into an agreement with the City of Henderson (the "**City**" or "**Henderson**") dated November 1, 1954, in which BMI agreed to furnish certain water pumped from Lake Mead through BMI's Water Facilities to the City. BMI also delivered water to the Las Vegas Valley Water District, the National Park Service, and Rose de Lima Hospital Henderson (now St. Rose Dominican Hospital, Rose de Lima Campus). For nearly a quarter century, BMI was the sole provider of water to the cities of Henderson and Las Vegas.

19.     However, the Supreme Court of the United States upended the water entitlements and agreements of BMI and the Industries with its opinion in *Arizona v. California*, 373 U.S. 546, rendered June 3, 1963, and its decree in that case, 376 U.S. 340, issued on March 9, 1964. In its 1963 decision, the Supreme Court construed the Boulder Canyon Project Act, approved December 21, 1928, 45 Stat. 1057, as requiring that water shall be released from Lake Mead for consumptive use in the Lower Colorado Basin states of Arizona, California, and Nevada only in accordance with contracts between the United States and water users for the storage and delivery of such water.[5]

---

[4]     On August 26, 1958, 11.51 c.f.s. (equivalent to 8,407 afy) was assigned to National Lead Company, believed to be the predecessor in interest of Titanium Metals Corporation of America. On November 1, 1958, .254 c.f.s. (equivalent to 184 afy) was assigned to The Flintkote Company. On August 26, 1958 and August 1, 1963, an aggregate of 12.384 c.f.s. (equivalent to 8,964 afy) was assigned to Stauffer Chemical Company.
[5]     *Arizona v. California* is within the penumbra of compacts, federal laws, court decisions and decrees, contracts, regulations, and guidelines concerning the use and management of the Colorado River among the seven basin states and Mexico collectively known as the "Law of the River." Significant Law of the River documents are available at https://www.usbr.gov/lc/region/pao/lawofrvr.html.

20.     Congress stepped in to honor the water entitlements and priorities of BMI and the Industries through an Act approved July 19, 1966, 89 P.L. 510, 80 Stat. 312, amending the Southern Nevada Project Act, approved October 22, 1965, 89 P.L. 292, 79 Stat. 1068. Section 3 of the Southern Nevada Project Act authorized the Secretary of the Interior to contract with the State of Nevada, acting through the Commission or other duly authorized State Agency, for the delivery of water and repayment of reimbursable construction costs. Through the 1966 amendment, Section 6 of the Southern Nevada Project Act provided that any contract under Section 3 shall provide that if, within five years from the date of Southern Nevada Project Act, BMI or its assignees applied for a contract for the storage and delivery of water in accordance with Section 5 of the Boulder Canyon Project Act and the regulations of the Secretary of the Interior issued pursuant to said Act, the rights of the party contracting under Section 3 of the Southern Nevada Project Act would be subordinate to those of BMI or its assignees to the extent of 41,266 afy, or so much thereof as is required for beneficial consumptive use by it, its rights to the storage and delivery of the same having been properly maintained in accordance with the terms of its contract. In other words, the priority of the entitlements of BMI and its assignees arising under Certificate Nos. 3118 and 3119 would be preserved, but the water pumped by BMI and delivered to water uses had to be "delivered" by the United States pursuant to a contract with the Department of the Interior.

21.     On September 18, 1969, the United States, through the Secretary of the Interior, the Commission, acting on its own behalf and on behalf of the State of Nevada, BMI, and the Industries entered into Contract No. 14-06-300-2803 for the Delivery of Water to Basic Management, Inc. (as subsequently amended, the "**1969 Contract**"). A true and correct copy of the 1969 Contract is attached hereto as Exhibit 1.

22.     The 1969 Contract provided for the United States to deliver to BMI, or to such successor of BMI as the Industries may designate, water from storage in Lake Mead for redelivery to water users as provided in Article 4 of the 1969 Contract. Specifically, the United States agreed to deliver annually at BMI's Lake Mead intake structure 41,266 afy of water or so much thereof as may be required for beneficial consumptive use as follows: (1) 32,587 afy for industrial purposes by BMI and the Industries and their successors, tenants, and assignees in lawful possession of the

Basic Complex, in the service area described in Certificate No. 3118; and (2) 8,690 afy for municipal purposes in the service area described in Certificate No. 3119.

23.     As a result of Defense Plant Corporation's prior appropriation under Certificate Nos. 3118 and 3119, the Law of the River, and the 1969 Contract, Basic Group's water entitlements acquired fourth priority status among Nevada's allocation of the Colorado River water, subordinate only to the present perfected, first priority rights of Fort Mojave Indian Reservation and Lake Mead National Recreation Area, the second priority rights of Lake Mead National Recreation Area, and the third priority rights of Boulder City, Nevada.

***Assignments of Entitlements After 1969 and Water Delivery Contracts***

24.     Ultimately, all of BMI's original entitlements under Certificate Nos. 3118 and 3119 were assigned to the Industries, the City, and the Southern Nevada Water Authority.

25.     Subsequent to BMI's assignment of the Industry Water Rights described above, BMI retained rights to 15,878 afy, which BMI was deemed to hold in trust for the Industries pursuant to paragraph 4(c)(ii) of the 1969 Contract.

26.     Pursuant to that certain Water Delivery Contract Between City of Henderson and Basic Management, Inc., dated May 22, 1990 (as amended by an Agreement Amending Water Delivery Contract, dated August 1, 1995, an Amendment to Water Delivery Contract, effective as of October 1, 2005, and a First Amendment to the Amendment, effective as of October 31, 2005, the "**City Water Delivery Contract**") and with the consent of the Industries as reflected in the "Assignment and Transfer of Entitlement to Delivery of Colorado River Water from Basic Management, Inc., to the City of Henderson, Nevada" dated May 22, 1990, the remaining water entitlements, comprised of 9,429 afy under Certificate No. 3118 and 6,449 afy under Certificate No. 3119, were assigned to the City (the "**City Water Rights**"). A true and correct copy of the City Water Delivery Contract, as amended, is attached hereto as Exhibit 2.

27.     On September 30, 1992, the Industries assigned portions of their entitlements, totaling 14,550 afy, to Victory Valley Land Company L.P., a limited partnership formed by the Industries, which then assigned the entitlement to Southern Nevada Water Authority ("**SNWA**") on November 17, 1994, pursuant to a second amendment of the 1969 Contract. In 2006, Kerr-

McGhee Chemical LLC assigned an additional 400 afy of its entitlement to a third party, which then assigned its interest to SNWA.

28.    As a result of these transactions, co-equal fourth priority entitlements totaling 39,036 afy are currently held by the Industries (8,206 afy), the City (15,878 afy), and SNWA (14,950 afy).

29.    Until July 1, 2022, Basic Water continued to deliver water to the Industries in accordance with the Industry Water Rights pursuant to the following contracts (collectively, the "**Industry Water Delivery Contracts**"):

    a.  Producing Companies Water Delivery Contract between Basic Water Company and Kerr-McGee Chemical LLC, dated June 4, 2002 (the "**Borman Water Contract**"), attached hereto as Exhibit 3;

    b.  Producing Companies Water Delivery Contract between Basic Water Company and Pioneer Americas LLC, dated January 2, 2007 (the "**Olin Water Contract**"), attached hereto as Exhibit 4;

    c.  Producing Companies Water Delivery Contract between Basic Water Company and Chemical Lime Company of Arizona dated June 19, 2007 (the "**Lhoist Water Contract**"), attached hereto as Exhibit 5; and

    d.  Producing Companies Water Delivery Contract between Basic Water Company and Titanium Metals Corporation, dated June 3, 2008 (the "**Timet Water Contract**"), attached hereto as Exhibit 6.

30.    In addition to the assignments described above, the Industries have assigned portions of their water rights amongst themselves. At present, the Industry Water Rights are currently allocated as follows:

| | |
|---|---|
| Borman (successor to Kerr-McGhee) | 703 afy |
| Lhoist (successor to Chemical Lime/Chemstar) | 84 afy |
| Olin (Pioneer Americas) | 2,564 afy |
| Timet (Titanium Metals Corporation) | 4,857 afy |

9

31.     Basic Water and its predecessors have continuously delivered water to the City and Industries in accordance with their respective allocations for almost 70 years.

32.     In addition to delivering raw water, Basic Water delivered treated water pursuant to a separate agreement for water treatment entitled "Water Treatment Contract Between City of Henderson, Nevada and Basic Management, Inc.," dated March 2, 1993 (the "**City Water Treatment Contract**"). Under the City Water Treatment Contract, for a fee, the City treats a portion of the Industry Water Rights and then transports that water to BWC for delivery to the Industries.

**B.     Capital Structure and Current Operations**

*Formation of BWC and SPE*

33.     BMI reorganized its business divisions into separate subsidiaries in the 1990s. Basic Power Company, a Nevada corporation, Basic Remediation Company, LLC, a Nevada limited liability company, Basic Environmental Company, LLC, a Nevada limited liability company, Basic Land Company, a Nevada corporation, and The LandWell Company, L.P., a Delaware limited partnership ("**Landwell**"), were formed to house the power distribution facilities, real estate management and sales, and remediation operations arising from the historical use of unlined evaporation ponds for the disposal of industrial and municipal effluent prior to 1976.

34.     BWC was formed in 1993 to house the Water Facilities and water delivery business. On June 30, 1993, BMI assigned its interest in the 1969 Contract to BWC pursuant to paragraph 3(f) of the 1969 Contract. A true and correct copy of the Water System Conveyance, dated February 11, 1993, is attached hereto as Exhibit 7. As the assignee of BMI, BWC assumed and continues to have all of the obligations of BMI under the 1969 Contract, including the water delivery obligations pursuant to paragraph 4 of the 1969 Contract for the volumes identified in paragraph 30 above. Further, BMI assigned to BWC its interest in the City Water Delivery Contract and the City Water Treatment Contract.

35.     In July of 2004, BWC formed SPE as a special purpose entity for the purpose of obtaining financing. Pursuant to that certain Assignment and Purchase Agreement dated as of August 5, 2004, as amended by the Amendment to Assignment Agreement dated as of September

22, 2016, and as further amended by the Second Amendment to Assignment and Purchase Agreement dated of as February 23, 2017 (as amended, the "**SPE Assignment Agreement**"), BWC conveyed the Water Facilities and City Water Delivery Contract to SPE, including: (a) machinery, equipment, fixtures, powerlines, underground pipelines, supervisory control and data acquisition system, and other tangible personal property used in connection with the Water Facilities; (b) real property, including booster stations, intake structures, pumping stations, electrical control houses, electrical substations, maintenance facilities, terminal, reservoirs, buildings, improvements, works, structures, pipelines or fixtures thereon, subject to certain exclusions; (c) easements, rights of way, and permits; (d) the City Water Delivery Contract, including the right to payment (the "**Contract Revenues**"); (e) other intangibles related to the City Water Delivery Contract, including prepaid expenses and insurance, deposits, bonds, contracts, licenses and permits, franchises, goodwill, privileges, technology, processes, and all similar intangible personal property; and (f) books and records relating to the Water Facilities or to their maintenance or efficient operation or to the Water Delivery Contract. A true and correct copy of the SPE Assignment Agreement is attached hereto as Exhibit 8.

36.    Under the SPE Assignment Agreement, as clarified by the Amendment to Assignment Agreement dated September 22, 2016, SPE agreed to pay to BWC all revenues from the City Water Delivery Contract not required to be paid or retained under a debt facility, make the use of the Water Facilities available to BWC in order for BWC to fulfill its obligations for water delivery to the Industries in accordance with the terms of 1969 Contract and the Industry Water Delivery Contracts, and operate the Water Facilities for the mutual benefit of BWC and SPE, including maintaining the Water Facilities in good and workable condition and making such repairs, replacements, and improvements as needed to carry on the business. In exchange , BWC agreed to pay and provide for all costs and expenses of operating and maintaining the Facilities. *See* Ex. 8, at Pages 90-91 of 177.

37.    BWC and its sister companies, with the exception of LandWell, are wholly owned by BMI.[6] The shareholders of BMI are TRECO, LLC, a Nevada limited liability company (62.959%), Pioneer Partners 2000, LLC, a Nevada limited liability company (31.976%), and Lhoist North America of Arizona, Inc., an Arizona corporation (5.065%). TRECO is a wholly owned subsidiary of Valhi, Inc. A wholly owned subsidiary of Contran Corporation owns approximately 92% of Valhi's outstanding common stock.

38.    BMI has historically provided a variety of services to BWC and SPE under a typical shared services arrangement, including management, tax planning, financial and administrative services. BWC pays BMI for an allocated share of payroll and benefits for employees, based on estimates of time devoted by BMI employees to Basic Water, along with rent, insurance, property taxes, other operating costs, and federal income tax payments made on behalf of BWC. The net expenses allocated to BWC by BMI totaled $2.2 million in 2019, $2.4 million in 2020, and $2.3 million in 2021. The current cost of shared services is approximately $150,000 to $175,000 per month.

***Financing***

39.    To finance the acquisition from BWC, SPE obtained financing in the original principal amount of $17,600,000, which was subsequently refinanced by a loan in the original principal amount of $11,900,000 (the "**2013 Loan**") from Meadows Bank on January 25, 2013.

40.    In order to (i) refinance the 2013 Loan, (ii) finance additional improvements (the "**Improvements**") to the Water Facilities and associated real property owned by SPE and described in the Deed of Trust as the Property, and (iii) pay issuance expenses related to the Bonds, SPE entered into a transaction evidenced by that certain Indenture of Trust dated February 23, 2017 between SPE, as Issuer, and Bank of Nevada, a division of Western Alliance Bank, an Arizona corporation ("**Indenture Trustee**"), as Trustee, of the Basic Water Company SPE 1, LLC, City of Henderson Water Delivery Contract Revenue Bonds, Taxable Series 2017 (the "**Indenture**"), pursuant to which SPE issued its $20,500,000 Basic Water Company SPE 1, LLC City of

---

[6]    LandWell is the successor to Victory Valley Land Company, L.P. It is owned 50% by Basic Land, its general partner, and 50% by BMI's shareholders.

Henderson Water Delivery Contract Revenue Bonds, Series 2017 (the "**Bonds**"). A true and correct copy of the Indenture is attached hereto as Exhibit 9. Western Alliance Business Trust (the "**Bondholder**"), an affiliate of Bank of Nevada, remains the Registered Owner of 100% of the Bonds outstanding.

41.    The Bonds are payable and secured by the "Trust Estate," which includes, among other things:  (i) the City Water Delivery Contract, (ii) the revenues from the City Water Delivery Contract (the "**Contract Revenues**"), (iii) the assets secured by the Deed of Trust, Pledge and Security Agreement and Fixture Filing with Assignment of Rents, recorded on February 24, 2017, as Instrument No. 201702240002702 (the "**Deed of Trust**"), including the Water Facilities; (iv) all accounts or subaccounts created under the Indenture and held by the Indenture Trustee, including all cash maintained therein. A true and correct copy of the Deed of Trust is attached hereto as Exhibit 10.

42.    The proceeds of the Bonds were applied as follows:  $8,499,500.69 to pay the 2013 Loan and the title company's fees, $858,450.00 deposited into the Costs of Issuance Fund to pay the fees and costs of professionals and other costs of issuance associated with the Bonds, and $11,142,049.31 deposited into the Improvement Fund created pursuant to section 3.02 of the Indenture. As of the Petition Date, the principal amount of the Bonds outstanding under the Indenture is $7,461,373, with interest payable semi-annually on June 1 and December 1 through the maturity date in 2032, at the rate of 5.34%, exclusive of fees, expenses, and other amounts due and payable under the Indenture.

**C.    Events Leading to Bankruptcy**

43.    SPE's intake structure on Saddle Island at Lake Mead is capable of drawing water down to an elevation of approximately 1,043 feet (above sea level) (the "**Failure Elevation**"), below which the intake is unable to draw in sufficient water to satisfy the Debtors' water delivery obligations under the Industry Water Delivery Contracts and City Water Delivery Contract.

44.    As the drought that began in 2000 continued to deepen, the Debtors began exploring the feasibility of extending the intake structure to ensure their access to raw water if lake levels continued to decline over the long term. In about 2007, the Debtors engaged a national engineering

firm to study options for extending the intake, and they recommended a design involving a floating barge with a wet well that would serve the existing intake. However, the Debtors ultimately determined that there were too many logistical impediments to implementation of the design within SPE's parcel on Saddle Island.

45.     In approximately 2014, the Debtors engaged another design firm with extensive experience in retrofitting steel truss structures like that used by the Federal Government when it constructed the intake structure. After a conditional assessment of the intake structure, the firm determined that the most feasible option would be an extension of the intake further into the lake by 84 feet, which would allow the intake pipes to be lowered to 995 feet. That design was completed in 2016, inclusive of structural, electrical, and mechanical improvement plans. In connection with this design, SPE ordered a new switch gear building and other equipment with long lead-times.

46.     In 2018, the Debtors sought bids for the project from three reputable construction firms and retained a local engineering firm with extensive structural experience in Nevada to assist in the bidding process. All three bids proposed changes to the completed design and were significantly more costly than the Debtors had contemplated. However, all three contractors also expressed reservations about the project because modification of the 80-year old structure would cause damage that might lead to a failure of the structure. Accordingly, they recommended that the Debtors pursue other options.

47.     In view of the risk of failure of the structure and the cost such a risky endeavor would entail, the Debtors elected not to proceed with the project and began pursuing alternative solutions. In 2019 and 2020, the Debtors engaged with the City of Henderson about a possible sale of the Water Facilities to the City. The City retained an outside firm to perform a condition assessment and appraisals of the real estate and system assets, but ultimately decided against acquiring the system. In early 2021, the Debtors approached SNWA regarding a possible acquisition of the system by SNWA or connecting SPE's Water Facilities to SNWA's "third straw" intake (IPS-3), which taps into the lake at 860 feet above sea level. However, the costs to the Debtors associated with these proposals would not be commercially viable based on the rates paid by the Industries and the City under respective water contracts.

48.     In 2021, the Debtors engaged Kiewit Corporation, a large engineering and construction firm, to explore alternative intake extension options. The Bureau of Reclamation's monthly 24-Month Studies (the "**BOR Projections**")[7] indicated that the Debtors would have at least two years after completion of the Kiewit assessment to construct improvements before the surface level of Lake Mead reached the Failure Elevation. However, even before Kiewit completed its assessment in October of 2021,[8] the BOR Projections had begun to shift dramatically. The problem compounded when the Bureau of Reclamation changed their projection methodology related to the use of historical flows, thereby compressing the runway time to complete any improvements. That, combined with an unusually bad snow year producing less than expected snow run-off into the Colorado River and upstream reservoirs releasing less water downstream in 2022, led to monthly declines in Lake Mead's projected elevations for the projected in-service date of the Kiewit improvements. In other words, given the accelerating pace of the decline, none of the designs could be constructed before the surface level of Lake Mead reached the Failure Elevation.

49.     As late as April of 2022, however, the Debtors expected to have the capability of delivering water until April of 2023, when the BOR Projections indicated the intake would be likely to reach Failure Elevation. Despite the projections, it became clear in May of 2022 that circumstances had become even more dire. While the December 2021 24-Month BOR Projection indicated a probable reservoir elevation of 1,053.32 feet in July of 2022, the May 2022 24-Month BOR Projection indicated a probable elevation of only 1040.42 feet (below the Failure Elevation) in July of 2022.[9] Furthermore, the latest 5-year BOR Projections indicated that, because of the pace of the decline, the new intake might be unable to draw water within a few years after its completion. While the 5-year BOR Projection as of May 2022 indicated a 13% probability of the reservoir

---

[7]     The BOR Projections project future Colorado River system conditions using single-trace hydrologic scenarios simulated with the Colorado River Mid-term Modeling System (CRMMS) in 24-Month Study Mode. Current and recent historical BOR Projections may be obtained at https://www.usbr.gov/lc/region/g4000/riverops/24ms-projections.html.

[8]     The assessment provided the Debtors with multiple options for extending the intake structure to reach approximately 1,000 feet.

[9]     According to the historical figure contained in the August 2022 24-Month BOR Projection, the reservoir elevation did reach 1,040.82 feet in July of 2022.

reaching 1,000 feet in 2024, that probably had increased to 23% by August 2022.[10] Accordingly, the Debtors determined that it was not in the best interests of the Debtors, their customers, or their creditors proceed with the project.

50.    In order to ensure their continued access to water while the parties sought a longer-term solution, the Industries negotiated an emergency interim solution for the continued delivery of water with the City, set forth in the Agreement for Temporary Potable Water Service, dated June 13, 2022 (the "**Interim Agreement**") executed and facilitated by Basic Water, attached hereto as Exhibit 11. The City and SWNA agreed to supply BWC with potable water to be redelivered to the Industries on a temporary basis if the Industries paid the fees and charges of SNWA and the City. To facilitate the Interim Agreement, the City and the Las Vegas Valley Water District entered into the Interlocal Agreement for City of Henderson Provision of Temporary Water Service to Basic for Redelivery by Basic to an Area Within the Las Vegas Valley Water District Service Area, dated June 16, 2022, attached hereto as Exhibit 12.

51.    The Interim Agreement provides, among other things, for the City to provide temporary potable water service to the Debtors at the point of connection between the City's public water system and the temporary potable water facilities constructed by the Debtors, for the Debtors to then transport the water to its terminal reservoirs and on to the Industries through the Water Facilities. The City charged the Debtors a deposit of $1,006,506.46, allocated among the Industries based on their 2021 monthly water usage. Furthermore, the Debtors were required to pay SNWA a regional connection charge of $4,515,079.00 and a System Development Charge in the amount of $386,019.00, both allocated among the Industries based on their demand.

---

[10]    The Department of the Interior estimated that Lake Mead's water level would fall below 1,050 feet msl in January – the threshold required to declare a Tier 2 shortage starting in 2023, and announced on August 16, 2022, that Lake Mead will operate in its first-ever Level 2a Shortage Condition in calendar year 2023. The August 24-Month Study of the Bureau of Reclamation projects Lake Mead's January 1, 2023, operating determination elevation to be 1,047.61 feet. This is calculated, however, by taking Lake Mead's projected end of calendar year 2022 *physical* elevation (1,040.78 feet) and adding the 480,000 acre-feet of water being held back in Lake Powell to Lake Mead's deemed capacity to maintain operational neutrality. Thus, the actual surface level elevation of Lake Mead is lower than the Bureau of Reclamation's projected elevation.

52.     The surface level of Lake Mead reached the Failure Elevation on or about July 1, 2022, and the intake structure stopped pumping raw water from the lake. The Industries' water needs were sustained for fifteen days by raw water stored in SPE's reservoirs. Once the reservoirs were exhausted, the Debtors began taking delivery of potable water from the City pursuant to the Interim Agreement.

53.     While the Industries continue to receive water that is critical to their operations pursuant to the Interim Agreement, buying potable water from the City is not a long-term solution. The 1969 Contract provides, among other things, that:

> [BWC] will receive the water delivered to it under this Contract at its intake structure in Lake Mead, and will pump and transport the same to the present terminal points of the Water Facilities or to such substitute terminal points as [BWC] and the [Industries] may agree upon.
>
> At such terminal points, [BWC] will redeliver to the [Industries], and such of their successors, tenants, and assignees as are in lawful possession of the Basic Complex, or portions thereof, so much water received by BMI from the United States as each [Industry] may reasonably require for beneficial consumptive use . . .

Ex. 1, p. 22, §§ 4(b) and 4(c). The Debtors can no longer receive water at the intake structure, pump and transport it to the terminal points, or redeliver it to the Industries for beneficial consumptive use.

54.     SPE also cannot deliver water to the City for the City's beneficial consumptive use pursuant to the City Water Delivery Contract. As a result, the City has stopped taking water under the City Water Delivery Contract, and SPE is not generating revenue under the City Water Delivery Contract to pay the Bonds. Instead, the Debtors and the Industries are paying the City for potable water at a rate that is four to five times higher than the rate for raw water.

55.     Further, the Interim Agreement is temporary, and the Debtors agreed to work expeditiously towards development of a permanent solution. The Debtors acknowledged that any provision of permanent water service that requires construction and/or use of City, Las Vegas Valley Water District, and/or SNWA facilities to deliver water to the Debtors and/or the Industries "will require a separate solution and agreement(s) amongst all affected parties" and agreed to "work

expeditiously and in good faith toward identifying a solution for the provision of permanent water service to the [Industries] … and establishing the Permanent Agreement that addresses the terms and conditions for such permanent water service." Ex. 11, pp. 8-9, § 2.13. The Debtors agreed to work in good faith toward finalizing a solution within three months of the June 13, 2022, Effective Date of the Interim Agreement, or on or about September 13, 2022. *Id*. While the Debtors have continued working toward a permanent solution with the City and SNWA, a viable permanent solution has not been achieved.

## FIRST DAY MOTIONS

**A.    Joint Administration of the Chapter 11 Cases.**

56.    In order to administer their Chapter 11 Cases optimally and efficiently, each of the Debtors seeks entry of an order directing procedural consolidation and joint administration of their Chapter 11 Cases pursuant to Sections 101(2) and 105(a) of the Bankruptcy Code, Bankruptcy Rule 1015(b), and LR 1015, with BWC's Chapter 11 Case denominated the lead case.

57.    The Debtors are "affiliates" as that term is defined under the Bankruptcy Code. BWC is the parent and sole owner of SPE, holding 100% of the membership interests in that entity.

58.    The Debtors believe that these Chapter 11 Cases will be more economical and efficient if they are jointly administered. The Debtors are both ultimately owned by BMI. They file consolidated tax returns with BMI and share a common management team, common accounting staff, and common business location with BMI and other non-debtor affiliates. The employees who provide services to Basic Water are employees of BMI. Many employees' job duties include work relating to both Debtors and non-debtor affiliates.

59.    Debtors are interdependent, both financially and operationally. For example, while SPE owns the Water Facilities and delivered water to the City pursuant to the City Water Delivery Contract, BWC utilizes the Water Facilities to deliver water to the Industries under the Industry Water Delivery Contracts in exchange for maintaining SPE's Water Facilities and is the party to the 1969 Contract with the Department of Interior as the successor to BMI.

60.    Accordingly, the Debtors anticipate that most motions, applications, and hearings will affect both Debtors, and joint administration will promote the economical and efficient

administration of the cases and reduce the cost of administration of the Chapter 11 Cases, including the cost of serving notices.

61.    The Debtors are seeking joint administration only for procedural purposes and are not presently requesting that the Chapter 11 Cases be substantively consolidated. Therefore, joint administration will not impair any creditors' right to recover from the assets of a particular Debtor or otherwise adversely affect any creditor or other party in interest. Rather, joint administration will relieve the Debtors and the Court of the burden of duplicative filings, simplify case administration, and benefit creditors by reducing the costs of administration.

**B.    Utilities Motion.**

62.    The Debtors filed their Utilities Motion seeking entry of an order: (i) prohibiting utility service providers, including those listed on Exhibit 1 to the Utilities Motion (the "**Utilities**"),[11] from altering, refusing, or discontinuing services on account of the commencement of these Chapter 11 Cases or any unpaid pre-petition invoices or pre-petition claims; and (ii) establishing procedures for determining requests for adequate assurance of payment.

63.    In the normal conduct of their business, the Debtors use water, electric, telephone (including telephone and data services), and other services provided by Utilities. In most cases, BWC is billed by the Utilities for utility services provided to BWC and SPE. In a few cases, the Utilities direct invoices for utility services provided to BWC and SPE to BWC's non-debtor parent company, BMI, which owned the Water Facilities and other assets prior to 2004.[12]

64.    Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their Chapter 11 Cases. Because the Debtors purchase water from the City and deliver it to their customers through a system that requires electricity to transmit the water to reservoirs and then through pipelines from the terminal reservoir to points of use, any interruption

---

[11]    The listing of an entity on Exhibit 1 of the Utilities Motion is not an admission that any entity is a utility within the meaning of 11 U.S.C. § 366. Although the Debtors believe that the list of companies on Exhibit 1 is complete, they reserve the right to supplement such list if the Debtors inadvertently omitted a utility provider.

[12]    The Debtors also pay BMI a portion of certain overhead expenses that are shared with BMI and other non-debtor affiliates. Shared utility services that are paid by BMI, rather than by the Debtors, are not included in this Motion.

of utility services, even for a brief period of time, would disrupt the Debtors' ability to provide water and cause the Debtors to lose revenue. Discontinuation of a utility service, particularly electricity or water, would effectively shut down operations. It is therefore critical that utility services continue uninterrupted during these Chapter 11 Cases.

65.     On average, the Debtors spend approximately $29,315 each month on utility costs, exclusive of water delivered by the City for service to the Industries pursuant to the Interim Agreement ("**Delivered Water**"), which the Debtors expect to be paid by the Industries. Based on the Industries' past water use, the Debtors anticipate that the monthly cost of Delivered Water will vary between approximately $211,000 and $342,000 per month, averaging approximately $268,000. BWC will invoice the Industries for the cost of Delivered Water based on their respective actual use.

66.     As of the Petition Date, the Debtors believe they are current on utility payments that came due on or before the Petition Date. The Debtors anticipate that they will be able to satisfy all administrative expenses on a current and ongoing basis, including Utilities, from unencumbered cash held by BWC on the Petition Date, SPE's use of cash collateral, and cash flow from ongoing business operations.

67.     Notwithstanding the Debtors' ability to pay their post-petition obligations, the Debtors recognize that certain Utilities may not be satisfied without further assurances. The Debtors seek to mitigate the Utilities' risk of non-payment, while maintaining adequate capital to operate their business during these Chapter 11 Cases, by establishing the Procedures described in the Utilities Motion. Separate negotiations with each of the Utilities would be time-consuming and unnecessarily divert the Debtors from other critical tasks related to the operation of their business and restructuring. If the Debtors fail to reach an early agreement with each Utility, they would have to file motions seeking expedited determinations as to adequate assurance or risk service termination.

68.     The proposed Procedures therefore preserve the status quo and ensure continued utility services, while providing a prompt forum for the resolution of any dispute as to adequate assurance.

**C.      Bank Accounts Motion.**

69.     The Debtors filed the Bank Accounts Motion seeking authorization to maintain their prepetition Bank Accounts (defined below) to avoid immediate and irreparable harm to the Debtors' estates that would ensue if the Debtors' banking procedures were to be disrupted during the Chapter 11 Cases.

70.     As of the Petition Date, the Debtors hold the following bank accounts (the "**Bank Accounts**") at Bank of Nevada:

| Debtor | Account Type | Last 4 Digits | Purpose |
|--------|-------------|---------------|---------|
| BWC | Money Market | 5354 | General |
| BWC | Checking | 8280 | General business operations |
| SPE | Checking | 6972 | General business operations |

71.     The aggregate balance of BWC's Bank Accounts as of the Petition Date was approximately $5,761,523.75. The balance of the SPE Bank Account as of the Petition Date was approximately $1,179,491.

72.     The Debtors routinely deposit, withdraw, and otherwise transfer funds to and from the Bank Accounts and manage all of their cash receipts and disbursements through the Bank Accounts.

73.     Revenue from the Industry Water Delivery Contracts is deposited into BWC's checking account and generally used to pay the costs of operating and maintaining the water system and other ordinary business expenses.

74.     Additionally, pursuant to that certain Indenture of Trust dated February 23, 2017 (the "**Indenture**") between SPE, as Issuer, and Bank of Nevada, as Indenture Trustee, SPE issued its $20,500,000 City of Henderson Water Delivery Contract Revenue Bonds, Taxable Series 2017 (the "**Bonds**") and the Deed of Trust, Pledge and Security Agreement, and Fixture Filing with Assignment of Rents, recorded on February 24, 2017, as Instrument No. 201702240002702 (the "**Deed of Trust**"), attached hereto as Exhibits 9 and 10, SPE granted the Indenture Trustee a security interest in, among other things (each of the following as defined in the Indenture): (a) SPE's interest in the Facilities; (b) that certain Water Delivery Contract; (c) the Revenues; and

(d) all accounts or subaccounts created under the Indenture and held by the Indenture Trustee, including all cash maintained therein. The following accounts were created under the Indenture (collectively, the "**Indenture Accounts**"):

| Debtor | Account Type | Last 4 Digits | Purpose |
|--------|--------------|---------------|---------|
| SPE | Money Market | 1685 | Improvement Fund[13] |
| SPE | Money Market | 4955 | Bond Fund |
| SPE | Money Market | 6124 | Revenue Fund |
| SPE | Checking | 9469 | Expense Fund |

75.    Historically, pursuant to the Indenture and that certain Collateral Assignment of Water Delivery Contract, dated as of February 23, 2017, payments due and owing by the City of Henderson under the City Water Delivery Contract were deposited directly into the SPE Revenue Fund. Pursuant to section 3.12 of the Indenture, funds in the Revenue Fund were applied first to the Bond Fund in an amount sufficient to pay the principal and interest due on the Bonds on the next payment date, then to the Expense Fund to pay the fees and expenses of the Indenture Trustee, and then, to the extent there were any remaining amounts, to BWC, which operates and maintains the water system pursuant to the 2004 Assignment Agreement between BWC and SPE.

76.    The Indenture Trustee contends that it holds the Indenture Accounts at the Bank of Nevada in trust for the benefit of the holder of the Bonds under the Indenture and Deed of Trust. Accordingly, the Indenture Accounts are not part of the Bank Accounts and are not subject to the relief requested in this Motion. As of the Petition Date, the balance of the Bond Fund was approximately $657,402 and the balance of the Revenue Fund was approximately $1,006,440.

77.    The Debtors also seek authorization to continue using their cash management system, including transfers by SPE to BWC to pay part of the costs of operating and maintaining

---

[13]    The Improvement Fund was created pursuant to section 3.02 of the Indenture to pay for the cost of authorized improvements to the Facilities (as defined in the Indenture). Prepetition, on September 9, 2022, SPE effectuated a partial redemption of the Bonds pursuant to section 5.01(a) of the Indenture by directing the Indenture Trustee to apply the funds in the Improvement Fund to the balance of the Bonds as consideration for the Indenture Trustee's waiver of the provisions of section 9.05 of the Indenture, section 2 of the Amended and Restated Operating Agreement of SPE, Article 9 of the Amendment to Articles of Organization of SPE, and any other provisions similar thereto contained in the Indenture or SPE's organizational documents as it relates to the commencement by SPE of a proceeding under the Bankruptcy Code. As a result, the balance of the Improvement Fund as of the Petition Date is $0.

the Water Facilities and other ordinary business expenses. The cash management system enables the Debtors to centrally control their funds, ensure the availability of funds when necessary to maintain and operate the water system, and conduct their operations efficiently and effectively. The Debtors' cash management system allows the Debtors to identify and account for transfers of funds and track and keep separate prepetition and postpetition payments.

78.    Continued use of the Debtors' Bank Accounts and cash management system, including transfers of funds from SPE to BWC, is essential to the Debtors' continued operations and the administration of the Chapter 11 Cases. Requiring the Debtors to open new accounts or implement a new cash management system would complicate their collection of revenue and payment of ordinary course expenses arising after the Petition Date, which would needlessly increasing operating costs.

79.    The Debtors believe that any funds deposited into the Bank Accounts are secure, as Bank of Nevada is an authorized depository in compliance with Section 345 of the Bankruptcy Code and the Debtors' deposits are federally insured by the FDIC to the same extent they would be in any other authorized depository.

## EMPLOYMENT APPLICATIONS AND RELATED RELIEF

### A.    Schwartz Law, PLLC Employment Application

80.    The Debtors seek Court approval of the employment and retention of Schwartz Law, PLLC ("**SL**") as their attorneys in the Chapter 11 Cases under the terms and conditions of the letter agreement dated November 29, 2021.

81.    The Debtors selected SL as their attorneys because of the firm's experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code. SL's attorneys have served as counsel for the debtors or significant creditors in many of the largest and most complex bankruptcy cases filed in this District during the last 15 years. Moreover, SL has extensive knowledge of the Debtors' business and financial affairs as a result of its representation of the Debtors prior to the commencement of these Chapter 11 Cases. Accordingly, the Debtors believe SL is well qualified to provide the legal services that will be required in connection with these Chapter 11 Cases.

82.     To the best of the Debtors' knowledge, based on the Debtors' disclosure of their equity security holders, officers, directors, affiliates, creditors, customers, and other parties in interest, the attorneys of SL: (a) do not have any present or prior connection with the Debtors, their affiliates, their creditors, any person employed in the Office of the UST, or any other party in interest, or their respective attorneys and accountants; (b) are "disinterested persons," as that term is defined in section 101(14) of the Bankruptcy Code; and (c) do not hold or represent any interest adverse to the Estate.

83.     Neither SL nor any attorney at the firm is or was a creditor, an equity holder or an insider of the Debtors.

84.     Neither SL nor any attorney at the firm is or was, within two (2) years before the Petition Date, a director, officer, or employee of the Debtors.

85.     Neither SL nor any attorney at the firm has an interest materially adverse to the interest of the Estates or of any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interest in the Debtors or for any other reason.

86.     Debtors understand that SL hereafter intends to apply to the Court for allowances of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including, but not limited to Sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Guidelines for Professional Compensation established by the Office of the United States Trustee, and further orders of this Court, for all services performed and expenses incurred after the Petition Date. It is contemplated that SL may seek interim compensation during this case as permitted by Section 331 of the Bankruptcy Code and Bankruptcy Rule 2016.

**B.      Force Ten Partners, LLC Employment Application**

87.     The Debtors seek Court approval of the employment and retention of Force Ten Partners, LLC ("**Force 10**") as their financial advisors in the Chapter 11 Cases under the terms and conditions of the letter agreement dated September 6, 2022.

88.     The Debtors selected Force 10 because they are well qualified to represent the Debtors in connection with the types of services requested herein. Force10 is an advisory firm that

specializes in financial and operational corporate restructuring, valuation, forensic accounting, complex litigation support, and computations involved in court proceedings and dispute resolution. Force 10 serves individual chapter 11 debtors, middle-market companies as well as their creditors, stakeholders, and professionals in roles including financial advisor, interim manager, fiduciary services, expert witnesses, financier and M&A advisor. Since their original retention in April of 2022, Force 10's professionals have become familiar with the Debtors' operations, assets, liabilities, expenses, and many of the potential financial and business issues that may arise in these Chapter 11 Cases. Accordingly, the Debtors believe that Force 10 has the relevant experience, expertise, and relevant knowledge regarding the Debtors' business and financial affairs to assist in assist the Debtors in their Chapter 11 Cases in an efficient and timely manner.

89.     To the best of the Debtors' knowledge, based on the Debtors' disclosure of their equity security holders, officers, directors, affiliates, creditors, customers, and other parties in interest, Force 10's professionals: (a) do not have any present or prior connection with the Debtors, their affiliates, their creditors, any person employed in the Office of the UST, or any other party in interest, or their respective attorneys and accountants; (b) are "disinterested persons," as that term is defined in section 101(14) of the Bankruptcy Code; and (c) do not hold or represent any interest adverse to the Estate.

90.     Neither Force 10 nor any professional at the firm is or was a creditor, an equity holder or an insider of the Debtors.

91.     Neither Force 10 nor any professional at the firm is or was, within two (2) years before the Petition Date, a director, officer, or employee of the Debtors.

92.     Neither Force 10 nor any professional at the firm has an interest materially adverse to the interest of the Estates or of any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with, or interest in the Debtors or for any other reason.

93.     Debtors understand that Force 10 hereafter intends to apply to the Court for allowances of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, including, but not limited to Sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Guidelines for Professional

Compensation established by the Office of the United States Trustee, and further orders of this Court, for all services performed and expenses incurred after the Petition Date. It is contemplated that Force 10 may seek interim compensation during this case as permitted by Section 331 of the Bankruptcy Code and Bankruptcy Rule 2016.

**C.      Interim Monthly Compensation**

94.      The Debtors filed their Interim Compensation Motion, seeking entry of an order authorizing and establishing procedures for interim compensation and reimbursement of expenses of professionals employed on behalf of the estate (the "**Professionals**"), including, but not necessarily limited to, Schwartz Law, PLLC, their reorganization counsel, and Force Ten Partners LLC, their financial advisors. The proposed procedures for the monthly payment of compensation and reimbursement of expenses to the Professionals (the "**Compensation Procedures**") are set forth in detail in the Motion.

95.      The Debtors also request that the Court require all persons (other than the Professionals) seeking professional compensation from the estate under Section 503(b) to adhere to the Compensation Procedures except as otherwise ordered by the Court.

96.      The Debtors anticipate these Chapter 11 Cases will generate and require a substantial volume of professional work, and thereby the accrual of fees by the Debtors' Professionals in amounts large enough to unduly burden the Professionals during the extended period before approval of interim fee applications.

97.      The requested Compensation Procedures will assist the Debtors and all parties in interest in monitoring the costs of administration and enable the Debtors to maintain level cash flow, implement efficient cash management procedures, and prepare accurate forecasts. Accordingly, the Debtors believe the requested relief is in the best interests of the Debtors, their creditors, and all parties in interest.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

Dated: September 10, 2022.

_____
Stephanne A. Zimmerman